Your Honor, the court case of the morning call, 2-12-117, Innovative Garage Door Co. v. High Ranking Domains, LLC, on behalf of the Avalanche, Mr. Michael Cotelier, on behalf of the L.A., Mr. Timothy Armstrong. Good morning, counsel. Mr. Cotelier. Good morning. In this case, the question is jurisdiction, and the issue is fairness. Whether or not it's fair for High Ranking Domains or HRD to answer in jurisdiction in this forum for having breached its contract with Innovative Garage Door. Now, this court has previously held in Kell v. Henderson that due process considerations basically are coextensive with those requirements for the long-arm statute, so that what we're focusing on then are things like minimum contacts and fair warning. And in my brief and in the trial court, I tried to address the notion of initiation. HRD says that it's not responsible, ought not to be held responsible in this jurisdiction because it doesn't have a presence here, the contract was informed here, and it doesn't do business here. Counsel, a special question. Let me ask you a basic question. Sure. Is it the plaintiff that has the burden of proving a prima facie case for jurisdiction? Yes. Okay. And I believe it does so by showing that the nature of the relationship that was established by HRD with Illinois residents and Illinois consumers was such that it brings it within the ambit of these considerations, both in terms of what the court has found in Keller v. Henderson as well as which also adopted the same virtual languages in Burger King. Counsel, how is HRD, what specific action here constitutes reaching out to Illinois? Do they send any e-mails to Illinois? Do they call people? What is the action they're taking that reaches them into Illinois? Well, it's the, I think that both Burger King and HEMI really kind of gives us the framework for that. What they've done is they've created a, typically a situation where perhaps somebody has a, creates an Internet website, and that website goes out to everywhere and someone responds back. So you've got pretty much a kind of a two-way line of communication. And for example, I just bought a kayak on the Internet. I saw an ad, I went on the Internet, bought the kayak, the kayak comes to me. I don't know how many kayaks they're going to sell in Illinois. I don't know whether they think that Illinois is a particular focus for that particular product. But in this instance, we have, we create, HRD created a system, created basically a process of contacting people in every state in the same way. What it does is it creates, notwithstanding the argument of counsel, an interactive website whereby consumers in the state are invited to contact HRD and to let them know that there's an interest in a garage door or repairs. Now, that's a separate, if I can interrupt you, that's a separate website than the one we're talking about here, right? It could be the same. Was it innovative? It could be the same, I don't know. Okay. Sorry. It's obvious that they have to, that the people from Illinois have to access something that HRD puts out there in order to be able to get that. Then once they become known to HRD, basically what happens is you've got an electrical U-turn. The consumer down in the state says, gee, I'm interested in a garage door. That goes electronically to their interactive website, and then it gets tagged so that if it turns out that you or you are the person who's the respondent or the person who's going to do the work, now that gets, you signed up. You signed up separately, maybe on the same website, because you had to interact with it. You had to get the download of that contract. You send the contract back, so now we've created the two ends of the U, the two ends of the loop. So the consumer now says, I'm interested in a garage door. That comes to HRD. HRD charges your card. Then it has, at that moment, electronically, albeit perhaps in milliseconds, an obligation to now transfer that information to you who have agreed to purchase it. And in terms of the contract, you're purchasing everything that HRD is going to get from the state of Illinois in your town on that subject matter. So if there's 50 people who call up or go on the Internet and say, I want to get something on a garage door, those 50 go into that computer. Those 50 get charged. Those 50 go out. There's no selection process. There's no filtering process. It says in the brief, the brief, it's automatic. So what's happening is that it can't be anywhere else but in the state because the state is both the provider of the raw material of the product sold, the lead. It is brought into the computer of HRD and then rerouted to Illinois to be implemented by the provider who's going to do the work. That creates the reaching out that was referred to in both the High Point decision and HEMI. Now, HEMI, you've got a situation where they're selling cigarettes. Now, those cigarettes can be manufactured in Puerto Rico or Honduras or wherever. But these products are being drawn out of Illinois. They only come from Illinois. They can only come from Illinois. So you're saying by sending them, you know, mining the clients in Illinois and then sending the product back to Illinois to the plaintiff that that creates this minimal contact. Absolutely. So your argument is that part of the performance takes place in Illinois. It must. You know, it would be easier if these were widgets. Of course. But now we're talking about electronic information. And is that actually a product? Isn't electronic information that goes from Arizona or Colorado, wherever it's coming from, to Illinois and it's delivered in Illinois? It's not a truck that's driving in Illinois and stopping at your plaintiff's place and dropping a load off. Is it the same though? Yes. Or is it different? Information is a product. In our era, it's a product. Information in the form of a subscription, whether you subscribe to the New York Times, you subscribe to a newsletter somewhere, you subscribe to whether it's online or anywhere else. If you subscribe to it, it creates a contractual obligation between you and whoever is going to provide it. And you expect that to be delivered to you just as it would be in the New York Times or the Chicago Tribune at your door. The difference is it comes electronically. Well, what's the difference here? I mean, is there a potential danger here? You're not saying that every person, every company that sells business on the Internet or sells products on the Internet is subject to jurisdiction in every state that it sells products to, are you? Of course not. I'm not saying that. But I'm saying that where you have a situation as in HEMI or here where it is the deliberate, intended, and pecuniary focus of the defendant to do business in a given state or any state as here or in HEMI, it's indiscriminate. I mean, they want to get as much business from any state and everybody they can everywhere. In a situation like that, you're separating yourself from the guy who's selling you the kayak because that is, as the cases have indicated before, is random. It's sporadic. You know, it's not predictable. But here's a situation where what you're creating is a relationship that's going to be continuous. It's going to be permanent. I mean, under the terms of this contract, my client had the right to benefit from this U-turn, if you will, for as long as it found it beneficial. But advertising is continuous as well, isn't it? I mean, what makes this different than advertising? Well, because advertising is not, once again, that goes into the question of whether it's sporadic or random. I found that kayak, again, use that example, to an advertisement in Audubon Magazine. Now, it wasn't really directed to me or focused to me as a specific person. But on the other hand, this arrangement or the arrangement in HEMI is focused on those people with a particular interest in a particular subject matter at a particular place. More so even in this case because I'm not concerned in addressing your interest in a garage door. And I'm not interested in you in Nebraska or in Iowa. I'm interested in you in Illinois because I need to get a provider. If you're going to come to me and say, I've got a garage door I want repaired or replaced, I can't get somebody in Nebraska. I need to link that. I need to create a link. And it's that link that distinguishes this or separates this from a mere advertisement. It's a process and a procedure that is really creating, that meets the criteria that was set forth by this court in Keller. But now, don't we have to focus, though, on the relationship between HRD and Innovative as opposed to the relationship of HRD and the other potential customers? Isn't it that we have to look at the former, correct, when we're talking about the minimum contacts and purposeful availment? Sure. So, what else is there then? You talked about the whole process, but actually in your relationship, your client's relationship, we have the downloading of a contract and the providing of the information. How do you see that as purposeful availment? And also, how is downloading a contract an interactive, how does that make the website interactive, that particular website, just downloading a contract? Which is then sent by mail, as I recall, or fax, to another state. Well, if you parse it out that way, then it becomes obviously more akin to my raft or my yacht. Yacht, I wish you were a yacht. Kayak. My kayak situation. Kayak. You just elevated yourself. It's your own yacht. In another two feet. I have a legal question. Is somebody who runs a kayak becoming a yachtsman? In another two feet, I could probably comment on that. But that makes it more akin to that kind of situation. Here we also have, though, and I must say that it didn't become apparent to me until I was preparing for this morning. There are two circumstances here which I believe give rise to initiation. One is that process I've been describing up to this point. And the other was, and it didn't occur to me that it was separated, but then as I looked, on page six of the respondent's brief, the appellee's brief, it's pointed out that the relationship after it was terminated by HRD could have been continued, but it says that my client elected not to pursue it any further, not to pursue other cities. What wasn't mentioned in there but was contained, and it's in the record, I think it's page 68 and page 75 of the Kemmel Law Record, is the affidavit of my client addressing the fact that after it was terminated, after HRD said you're done, it then reached out and sent an email to HRD, to Innovative Garage Door, offering a list of other cities. They're all listed on page 75 of the record, and this was on December 3rd of 2009. That's after it said that it could cut off the contract in November of 2009. So we have a separate, distinct initiation between HRD going to Innovative saying, we've taken these cities away from you, here's some more, here's some others. Not the ones that you've chosen, but we're chosen for you as alternatives because we gave yours away. And you're saying that supports the argument they're not simply a conduit, they're interactive with Illinois residents. Exactly. And, in fact, there are cases that say that particular reaching out alone creates the basis for personal jurisdiction within this state. So it's the continuous process that involves several vendors. We've got another one that's referred to in the affidavit from my client that indicates that there was at least one other party. So they're looking to get as many people, obviously. If somebody from KRO Illinois says, I want a garage door, you need a provider in KRO. Somebody in Wheaton's not going to do the job. So it is to their advantage to create as much of a revenue stream from Illinois from the consumers back to the providers. And that touches almost every one of the criteria in Keller. When we look at the traditional factors in these contract cases and who initiated the transaction, would you agree that your client initiated the transaction? That's right. I guess I'm saying that given the evolution of the Internet, of Internet business, that the question of initiation takes on color. It's not a black and white thing. It's kind of like, you know, the trouble with this kind of, this area of the law, it's kind of like, as I was indicating to my opponents out in the waiting room, that it's kind of like what the Pursuit Court Justice said about pornography. You know, we can't define it, but we know it is and we see it. You know, and it's one of the difficulties of this. I think that as commerce evolves, so also is our perception of what initiation, when it was just advertisement, or if it's a letter coming in back in the day when we didn't have to deal with Internet, then it was simple to say that's an issue. In fact, there's a case in this division, in this district, that says that if somebody, there's an ad out there, and you respond to that ad, that constitutes the initiation of the relationship between the parties. But we now have Burger King, and we now have Hemi, and we now have OnePoint, and those things recognize that there are now efforts out there in cyberspace to deliberately and comprehensively target a location for the business that's being done. And I think that that comes under the rubric of reaching out. And reaching out becomes a kind of a synonym, you know, for initiation within a context. It would certainly not be the case where we're dealing with me dealing with these guys with the kayak, because they don't know that they're going to deal with me. They don't know they're going to deal with someone. Maybe they don't sell one kayak, and they'll know I own this here. But that's different from HRD. It wants to sell every, it wants to get $15 for everybody's concern about every garage door in this state if it can. And that certainly creates purposeful and financial involvement, and it creates a reliance and a relationship on the part of those people who enter into the relationship with it. And it certainly creates, it's in substantial furtherance, you know, of its activities, a substantial furtherance of that contract. Do you argue specific jurisdiction, general jurisdiction? Specific jurisdiction. Gotcha. Great. Thank you. You'll have an opportunity to reply. Thank you. Mr. Armstrong? Good morning. Timothy Armstrong on behalf of the Appalachian High Ranking Donors. I like to call them HRD because it just takes a little too long. No, that's fine. I was going to end with this, but based on what Counselor just said, I think it's better to start with this. It's a case that he cited in his reply brief. It's a Jennings case. And there's a comment on page four of the case that says, with the omnipresence of the Internet today, it is unusual to find a company that does not maintain at least a passive website. Premising personal jurisdiction on the maintenance of a website without requiring some level of interactivity between the defendant and the consumers in the foreign state would create almost universal personal jurisdiction because of the virtually unlimited accessibility of websites across the country. And I think that's exactly what Counselor is trying to do in our situation. We didn't reach out to him. We would not have known who Innovator was until they contacted us. And I really want to clarify the fact that consumers in Illinois are not charged a penny for our services. They come to our website. They ask for, I need help finding someone to either sell me a garage door or fix my garage door. And then some contractor in Illinois is given the lead for that person to go follow up. That's all it is, is that you reach out to Illinois to grab these people. I mean, we don't reach out at all. Well, you have a website. We have a website that they can contact. That they can contact. Correct. So would you describe that website? And that's different? Is it the same website? It's the same website. That Counselor Donnelly, that Counselor Clank Donnelly. Yes, it is. Okay, so that website that people can contact. So you just have it out there and then they contact you and then you forward the leads on it. Correct. So is that best not interactive? You don't see that as interactive? No, because they can't purchase anything. They can't purchase a contractor. They can't sit there and say, give me contractor A. Well, is there a definition of interactive? Yes, exactly. Do you have case law? I mean, where do we find the definition of interactive? Because I would have thought, and I'm not that technically savvy, that downloading a contract and then it would be interactive. We feel that interactivity is more such as an Amazon.com website where you can pick out just about anything you want. You can look for shapes, sizes, and colors and different things, determine which one you want, and then have it shipped to your house. In our situation, the consumer can't pick out a contractor, nor can the contractor pick out a consumer. He can't sit there and say, I want a nice little blue one so I can go help them out. They can't sit there and say, I want, you know. So interactive is synonymous with selective choices. Choices. So a website that gives choices. Correct. This website thing, I know I'm getting bells in with this, but let's leave the websites aside. This is a situation where your client entered into a three-and-a-half-year contractual relationship with the plaintiff, correct? It ended up being three-and-a-half years, yes. Initially, there was no limit on it. So your client is a foreign corporation, enters into what ends up being a long-term contractual relationship with an Illinois company and takes Illinois residence information on the website and then forwards it to Illinois to this company. How does that happen in the least minimum context in this case under this factual situation, leaving the websites out of it? Well, it's similar to HEMI. It sounds weird for me to talk about HEMI because it appears to go against me, but it really doesn't because HEMI talked about the fact that there was no general jurisdiction because there was no continuous and systematic general business context within Illinois to justify general jurisdiction, despite the fact that they sold 300 packages of cigarettes to one Treasury official over a two- to three-year period. There's no general jurisdiction there. The reason they found specific jurisdiction in HEMI was not because they were shipping cigarettes into Illinois, but because they failed to comply with their reporting requirements. And the court even goes on to say that under commercial law, the sales took place in New Mexico, except that we're not finding that they violated commercial law. We're saying they're violating an Illinois statute by failing to comply with the reporting requirements. There was no commercial – there was no contract between us and the consumer. They didn't get charged anything. And Innovative Garage Door doesn't get charged anything until we send them a lead. If nobody from Illinois called for Garage Door, they don't get charged anything. They only get charged if we forward that information on to them. And I think it's really important to note that, you know, in their brief, they say they first saw us in a national magazine. And then the magazine had a listing of the website. Then they went to the website. Our website didn't attract Innovative. They saw us in a national magazine, which is nothing more than advertising. The other thing is, you know, looking through the Bolger analysis, in their brief they say that the contract was sent by Innovative to HRD in Arizona for acceptance. The contract wasn't a contract until it was sent to us for acceptance in Arizona. They also admit in their brief that from its location in Arizona, HRD sold 150 leads per year to Innovative in Illinois via the internet. There's nothing in the record that shows that when HRD – I mean, when Innovative got those leads, they were actually here in Illinois. They could have been in Indiana. They could have – Let me ask you this. Finish your talk. I have a question. They could have been somewhere else. The way technology is, the reason – I mean, I have a 630 area code. I'm on vacation in Europe. I get a phone call there. That doesn't mean I'm in the 630 area code. It's just that that's where the number was sent to. That's where the information was sent to. There's nothing in the record to show that on every single one of these leads that they got, that they were in Illinois when they received them. Counsel, how do you respond to this? HRD bills itself as an internet company that specializes in search marketing and its garagedoorsofamerica.com site specifically invites Illinois residents to fill out forms seeking information and lists Illinois as an area served on its home page, indicating that it targets Illinois for its services. Thus, it's ongoing use of the internet with specific contacts in Illinois. Is that simply like selling a product over the internet, a one-time transaction? For each consumer, it is absolutely a one-time transaction. I can't imagine they would want more than one garage door or have it serviced more than once. Do you target Illinois residents on the website? No. We have a website that's accessible for people in Illinois. It doesn't target people in Illinois. I mean, the case law has said targeting is reaching out to you, sending you a direct mail, sending you an e-mail, sending you something more than just having a website that's accessible to someone in Illinois. I think that if we start going down that road, any website that's accessible in Illinois could potentially subject them to jurisdiction. That would mean that any time you advertise any product on the internet, you could be sued in 50 states. I don't think your opposing counsel would even say that that would be enough. But on the other hand, your argument with this paradigm for a business could only be sued in Arizona or Colorado or wherever they're located. And that was the question I was about to ask. And since you're using the internet, if your business took it up to the International Space Station and ran it from up there, it couldn't be sued anywhere. Well, no, it could be. It's an LLC from Arizona. It could always be sued in Arizona. Arizona, Colorado. And he's currently doing business in Colorado. Except for the Space Station. It'd be hard getting service up there, I think. Well, we've had some interesting developments. He's becoming Yatsman. I'm bringing this kayak, and you're going to the Space Station. I'm trying to bring this back down to Earth, this case. And that's exactly what we're trying to do here as well. We sit there. Bolger's a fantastic case, not just because he came. It was just because he came from the 2nd District. It gives us a roadmap on how we analyze these things. He's way in general jurisdiction because he has to. I mean, it's just a huge hurdle, and we're not doing business in Illinois to satisfy that hurdle. Just like the cigarette company and him, he wasn't doing it as well. But when you start looking at the 3 factors to decide whether or not the contract was there were contacts in Illinois, who initiated the transaction? They called us. Again, we would not have known who Innovative was until they contacted us. But you never call anybody. Correct. You never initiate any transaction from their point of view. Absolutely. Absolutely. The second is where the contract was formed. It can only have been formed in Arizona where it was accepted. Otherwise, they could download a contract, sign it, put it in their drawer, never send it to us, and claim that they have a contract with us. And it can only be the contract specifically states it has to be accepted by HRD, and that was in Arizona. And then finally, where performance was to take place. And here's the thing. We differ substantially. Our performance was to send leads. And all we had to do was push a button either via e-mail or to send something via text message to the phone, and that button was pushed either in Colorado, Arizona, but it was never pushed in Illinois. Performance, they take a look at what the defendant does inside the state, not what the plaintiff does. And what we did inside the state was absolutely nothing. All we did was we sent a lead from either Arizona or Colorado. And then counsel states that they were sent from our location in Arizona. And as soon as we send the lead under the contract, we perform. With respect to the billing, counsel's a little off on that. We bill twice a month on billing cycles. That's what's in the contract. And basically you have to give us your credit card information prior to setting this whole thing up. And then twice a month we bill you for the leads that we sent to you previously. It's not a per lead, per bill, because otherwise I think the lead, the cost of the leads were $1.50. And so, I mean, it just doesn't make any sense for us to do it that way. So they wait during a two-week period. I think there's also language in the contract that says if you have less than five leads during that two-week period, we'll carry over to the next one. So everything that's done, the billing for these leads, is also done in Arizona when we submit the payment to the credit card company. There's nothing done in Illinois. I mean, the hard thing about this case is I can't tell you exactly where everything was done, but I can tell you where it wasn't done. And it wasn't done in Illinois. And if it's not done in Illinois under the Bolger factors, then there's no sufficient context here to hold this liable. I mean, we take a look at whether or not it offends the notions of fair play and substantial justice. And we take a look and see if, you know, it's fair to hail us into court in this jurisdiction. And it certainly isn't. And, you know, the Burger King case talks about, first of all, it's a pre-Internet case. I think it's a 1984 case. And it talks about companies that purposefully direct their activities toward other people, that reach across beyond one state into another. And it can't be said that we did that here. Again, we don't know. We would not have known who Innovator was until they contacted us. That's the way the business is set up. Well, I mean, directing your activities to citizens in Illinois, it can be argued at least that that goes on by trying to get these people through this Web site to respond back to you asking about a garage door. I don't think I can concede that. I think it only makes sense for us to connect consumers in Illinois with providers in Illinois. It doesn't make any sense. Would they have a better leg to stand on than Innovator? Initially, I would say no, because there's nothing they could order from us. If they sued us for giving them a bad referral, I don't know really how that plays out. I haven't given that as much thought. But I do know that, again, we didn't reach out to them. They contacted us. We didn't give them the name of a garage door company. We gave it to the garage door company. We gave them a name and a phone number. Do they just check a box? I mean, there isn't anything interactive, or they have no choices? My understanding now of the way— On that Web site? I don't know exactly how it worked in 2007. My understanding of the way the Web site works now, I live in Glen Ellyn. If I type in Glen Ellyn and I need garage door repair, a number pops up on the screen.  And then at some point later in time, through some software that my client purchases that's held in Wichita, Kansas, they take a look at those phone calls, and they look at the duration of the phone calls, and typically anything over a minute and a half they think is a valid phone call, and they charge for those leads. So right now, there's no contact with us. But the critical time is how it operated when the case was commenced. Correct. I mean, I can't tell you how the Web site ran in 2007. I have no idea. All we have is what the counsel has told us, and it says they can't get it through an email. And the sending of the email can only be done if it's sent through—I mean, our performance is to send the lead. We send the lead. We do all that in Arizona. Again, interesting note with the HEMI case, because they refer to this Jennings case a couple of different times. They say that we do not read Jennings to stand for anything more than the accepted notion that a Web site that provides only information does not create the minimum context necessary to establish personal jurisdiction over a defendant in a particular state. That's all we do, is we just give them permission. We give a name and a phone number. We don't tell them where the address is. We don't tell them what exactly they're looking for. We give a name and a phone number. If they call them up and they book a sale, that's great. If they don't call them up, it doesn't matter to us. If they don't make a dime on any of these leads, it doesn't matter. All we have to do is provide them with a name and a phone number. Absolutely. I mean, that's one of the things they talk about, I think, in Zippo, if I'm not mistaken, whether the defendant derives profit directly from Web-related activity. We don't derive profit from Illinois consumers. We derive profit from sending a name and a phone number. Again, it's a lot easier if they are widgets. Widgets are sent from an address to an address, a physical location. You can't send a widget through the Internet. I mean, the same thing with Hemi. Hemi turns around and they sell cigarettes from New Mexico into an address here in Illinois. There's a physical location in New Mexico where it has to leave or somewhere else, and there's a physical location in Illinois. Under these Internet cases, the fact that you provide services in Illinois doesn't say that you're an Illinois company. So information would not be a product. That's exactly what we're saying. Do you have any cases that say information cannot qualify as a product? I don't, other than the note from Jenny's where it says if your website provides only information, it doesn't provide sufficient context. Are there pleadings in this case, though, or filings from the plaintiff that they received this information, these leads, at their offices in Illinois? I mean, I know you're arguing that they couldn't receive anywhere. No, I don't think there is. I think they said that we sent 150 leads a year and then we stopped sending them. I don't think there's anything in the pleadings other than the paragraph that says that they're an Illinois corporation that says that we knew at the time we did business with them that they were an Illinois corporation. In fact, the corporation that we started selling leads to is actually the nationwide corporation in Florida that does work in Illinois. Thank you. Mr. Cousineau. The comments raised by counsel with respect to the notion that you can create a business on the Internet that has no place, that has no responsibility, and that has no, but yet makes money, is kind of disingenuous. It was actually specifically commented on in that respect. In the one-point solutions case that I've cited where the court there set a relationship, and this was a relationship at the time based upon telephone and mail, but it's a relationship naturally based upon telephone and mail. In this case, the case at one point was email. Rather than physical presence should not allow defendants to avoid jurisdiction based upon that distinction. And he pointed out the fact that in HEMI, he made the point that HEMI was, that they didn't, it was the failure to file the reports that was the basis for finding jurisdiction there. And, of course, I indicated in my brief that that's not the case. That really, that was the cause of action, but it wasn't the basis for jurisdiction. And at the very end of that decision, the court states, here we affirm the district court's conclusion that HEMI is subject to personal jurisdiction in Illinois, not merely because it operated several interactive websites, but because HEMI had sufficient voluntary contacts with the state of Illinois. The voluntary contacts being the reaching out, the selling of the cigarettes, the selling of the products. That formed the basis for jurisdiction, not the fact that it didn't file the report. That's, of course, what created the claim. But the jurisdiction was the method and the manner and the consistency by which this particular defendant, in that case, did business. He points out the fact that there was a distinction with Amazon and HRD. Amazon can sell headphones. It can sell music. It can sell things like that. And that that's how, that somehow differentiates it from this. I don't think that's the focus of analysis. The focus of the analysis is, is a business creating a revenue stream out of its interaction with this state? And whether Amazon's model of creating the revenue stream is to sell you a cell phone, okay? The revenue, the business model for HRD is to sell you information. And that information is in the form of a sales lease. It's no different than, you know, I recently, again, using a personal example, I get Golf Magazine. You switched to golf. You've given up on kayaking. I'm just expanding. So, you know, Golf Magazine is now coming to my iPad, okay? Now, he says that their performance was met, the requirement of performance was met when they pressed the button in Arizona. I think they're different. I want that. I want to see that magazine in my iPad. I don't care what they did in Arizona or what they do, wherever Golf Magazine comes from. I want the product. That's what I'm paying for. And so, therefore, the obligation that's created in this stream of revenue doesn't get fulfilled until there is fulfillment, until somebody gets what they need. Now, in this case, they're saying, well, you know, the consumer doesn't pay for anything. Well, no, it doesn't. But still, there's a revenue stream created by this model. It's the model that makes the engine of revenue that we look at and the means of interaction with the persons in this state, whether they be providers or the like. That's interesting because he also said that they didn't know who Innovative was, you know, thereby trying to sidestep the notion of accountability because they didn't particularly target Innovative. Well, they didn't target Innovative as an individual business, perhaps, but they targeted Innovative as a class of businesses which would have been meaningless to contact tailors. It's meaningless to contact auto repair dealers. But they needed to get somebody in each jurisdiction or each town to be able to respond to these inquiries coming from the consumers. You used a nice catchphrase, they created a revenue stream by targeting Illinois residents. How is the targeting taking place? His argument is, look, we have a website. We don't target anybody. You target us. You in Illinois contact us. We don't target anybody. Well, I suppose you have to then go back and perceive, again, it's this question of reaching out. If you look at the target in the sense of I'm trying only to get garage door people in the state of Illinois, then that's one issue with respect to targets. If you, on the other hand, say I'm targeting the United States, every state in the United States, which is what I think, I forget which decision it was, whether it was Burger King or Hemi, one of them that said that if you're, in effect, addressing trying to get everybody everywhere, it's kind of disingenuous to say that you don't intend to get somebody from Illinois, that it's not a target of yours. It's just a question of what's the scope. If the scope is national, then obviously Illinois is a target. If the scope is the East Coast, then Illinois is not a target. If it's the West Coast, it's not a target. So it's targeted in the sense that they want everybody from everywhere. And Illinois is a lesser included target within the larger target. They're not saying we're excluding Illinois. We don't want anybody from Illinois. They definitely want people from Illinois. They've got at least two, and they gave it to a third. Now, I didn't argue general jurisdiction because I had no way of knowing without prior, without discovering how many of these vendors and how many of these contacts and what the scope is within the state of Illinois. I would suspect that if I did have that, access to that information, a greater argument could be made for general jurisdiction as well. But I'm only dealing with what happened to my guy as it relates to this particular transaction because that's all I know. That's all we have evidence for. And we know that there's at least two folks who were doing business with HRD on the same model in the same way. And that goes to the continuous and permanency of the relationship. Thank you. Thank you, Counsel. All right. At this time, the court will take the matter under advisement and render a decision in due course. The court stands in recess until 1 o'clock. Thank you.